**FRIED ALLIGATOR FILMS, LLC; and**                              **PLAINTIFFS**
**JERRY TANKERSLEY**

**V.**                                                                          **NO. 4:16-CV-175-DMB-JMV**

**NEW YORK LIFE INSURANCE**
**COMPANY; MICHAEL WILLIS; and**
**JOHN DOES 1-10**                                                    **DEFENDANTS**

## ORDER

Before the Court are (1) New York Life Insurance Company's "Motion for Summary Judgment and for Dismissal," Doc. #25; (2) Michael Willis' unopposed motion to exceed page limits, Doc. #44; and (3) Fried Alligator Films, LLC and Jerry Tankersley's "Motion to Strike New Legal Arguments and Evidence Raised in Rebuttal to their Memorandum Brief in Opposition to Motion for Summary Judgment and for Dismissal," Doc. #47.

## I
## Procedural History

On July 15, 2016, Fried Alligator Productions, LLC and Jerry Tankersley filed a complaint in the Circuit Court of Leflore County, Mississippi, against New York Life Insurance Company ("NYL"), Michael Willis, and John Does 1-10. Doc. #2. In the complaint, Fried Alligator and Tankersley alleged that the defendants sold them a universal life policy, rather than a custom whole life policy proposed by Tankersley, which was to be used as collateral to finance Fried Alligator's business operations up to $5,000,000. The plaintiffs further alleged that the universal life policy could not be used for its intended purpose.

On August 15, 2016, the defendants removed the state court action to this Court on the

basis of diversity jurisdiction.[1]  Doc. #1 at ¶¶ 4–7.  NYL and Willis answered the complaint on August 30, 2016, and September 6, 2016, respectively.  Doc. #10; Doc. #12.

On October 14, 2016, the plaintiffs, with leave of the Court, filed an amended complaint against the defendants.  Doc. #22.  In the amended complaint, the plaintiffs assert claims for (1) "Negligence," (2) "Breach of Fiduciary Duty," (3) "Breach of Contract," (4) "Breach of Implied-in-fact Contract," (5) "Breach of Duty of Good Faith and Fair Dealing," (6) "Misrepresentation," (7) "Promissory Estoppel," (8) "Equitable Estoppel," (9) "Third Party Beneficiary," (10) "Vicarious Liability," and (11) "Gross Negligence and/or Malicious Conduct."  Willis and NYL answered the amended complaint on October 19, 2016, and October 28, 2016, respectively.  Doc. #23; Doc. #24.

On October 28, 2016, NYL filed a "Motion for Summary Judgment and for Dismissal." Doc. #25.  The same day, Willis filed a "Joinder of Defendant Michael Willis in Defendant New York Life Insurance Company's Motion for Summary Judgment or, in the Alternative, for Dismissal," in which he joins NYL's motion and asserts additional grounds for summary judgment as to the plaintiffs' contract-related claims against him.  Doc. #27.  The plaintiffs filed identical responses and supporting memoranda to NYL's motion and Willis' joinder on January 9, 2017.[2]  Doc. #28; Doc. #29; Doc. #30; Doc. #31.  The next day, the plaintiffs filed a supplement to their responses, Doc. #33, and an affidavit exhibit, Doc. #33-1.

On January 27, 2017, NYL moved to exceed by 10 pages the page limit for its reply to

---

[1] On August 16, 2016, United States Magistrate Judge Jane M. Virden ordered the defendants to show cause why the case should not be dismissed for lack of diversity jurisdiction for their failure to adequately identify Fried Alligator's members.  Doc. #4.  The same day, NYL filed an amended notice of removal, joined by Willis, and a response to the order to show cause, further detailing Fried Alligator's members.  Doc. #5; Doc. #6; Doc. #7.  The amended notice of removal, together with the response to the order to show cause, sufficiently allege diversity jurisdiction.

[2] The case management order authorized the early filing of summary judgment motions by the defendants, and specified that "[o]nly discovery relevant to the summary judgment motions shall be permitted and it shall be completed 60 days after the motions are filed, after which responses will be due w/i 14 days and replies w/i 7."  Doc. #19 at 2.

plaintiffs' responses. Doc. #42. This Court granted the motion in part, allowing NYL an additional five pages. Doc. #43. In the order, the Court noted that inasmuch as the motion was not a joint motion, the order applied only to NYL and no other defendant. *Id*. at 1 n.1. Willis then moved for an additional five pages to reply. Doc. #44. On January 31, 2017, NYL filed a reply to plaintiffs' responses, which Willis joined. Doc. #45; Doc. #46.

On February 9, 2017, the plaintiffs filed a motion to strike certain arguments and evidence raised in NYL's reply and Willis' joinder. Doc. #47. On February 21, 2017, NYL responded to this motion, and Willis joined the response. Doc. #49; Doc. #50. On February 28, 2017, the plaintiffs filed a reply. Doc. #51.

## II
## Procedural Matters

### A.  Motion to Strike

The plaintiffs contend in their motion to strike that NYL's reply raises new arguments and is supported by new evidence not previously relied on by NYL in its motion. The plaintiffs request that any new arguments and evidence not be considered by the Court in evaluating the summary judgment motion or, alternatively, that they be given an opportunity to respond. NYL argues that each argument and piece of evidence responds to arguments the plaintiffs raised in their response.

A reply and any accompanying brief are generally limited to addressing matters presented in a motion and a response. *See AAR, Inc. v. Nunez*, 408 F. App'x 828, 830 (5th Cir. 2011) ("Generally, and for obvious reasons, a reply brief is limited to addressing matters presented by appellant's opening brief and by appellee's response brief, and is not the appropriate vehicle for presenting new arguments or legal theories to the court.") (internal quotation marks omitted). A review of the relevant documents shows that the matters the plaintiffs find objectionable in

3

NYL's reply are responsive to arguments and evidence in the plaintiffs' responses to NYL's motion. Consequently, such matters were not raised for the first time in NYL's reply. Accordingly, the plaintiffs' motion to strike will be denied.

## B. Willis' Motion for Additional Pages

Willis seeks an additional five pages for his reply in support of NYL's motion, which he joined. As grounds, Willis incorporates by reference the reasons advanced in NYL's motion for additional pages, which this Court granted in part on January 30, 2017. Doc. #44 at 2; Doc. #43. For the reasons stated in the January 30 order, Willis' motion for additional pages is granted.

## III
## Standing

The defendants seek dismissal of all Fried Alligator's claims on the grounds that Fried Alligator lacks standing to assert claims based on policies on which it is not the insured or a third-party beneficiary, and that Fried Alligator fails to state a claim upon which relief can be granted. Because standing is a jurisdictional requirement, the Court will address Fried Alligator's standing first. *See Cole v. Gen. Motors Corp.*, 484 F.3d 717, 721 (5th Cir. 2007) ("[W]e must resolve the standing question as a threshold matter of jurisdiction.").

## A. Standard

"Granting summary judgment is an inappropriate way to effect a dismissal for lack of subject matter jurisdiction." *Bank One Tex. v. United States*, 157 F.3d 397, 403 n.12 (5th Cir. 1998). Accordingly, a court should construe a motion for summary judgment predicated on a lack of jurisdiction as a motion to dismiss under Rule 12(b)(1). *See Fox v. Leavitt*, 572 F.Supp.2d 135, 140 n.5 (D.D.C. 2008) ("Although CMS's motion requests summary judgment[,] ... the request to dismiss based on … lack of standing is properly treated as a motion to dismiss for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1)."). This Court therefore

will analyze NYL's standing argument as a motion to dismiss for lack of jurisdiction under Rule 12(b)(1).

"A motion to dismiss for lack of standing may be either 'facial' or 'factual.'" *Superior MRI Servs., Inc. v. Alliance Healthcare Servs., Inc.*, 778 F.3d 502, 504 (5th Cir. 2015). Where, as here, "the defendant submits affidavits, testimony, or other evidentiary materials" in support of the motion, the attack on standing is considered factual. *Id.* (internal quotation marks omitted). "To defeat a factual attack, a plaintiff must prove the existence of subject-matter jurisdiction by a preponderance of the evidence and is obliged to submit facts through some evidentiary method to sustain his burden of proof." *Id.* (internal quotation marks omitted).

"[S]tanding is perhaps the most important of the jurisdictional doctrines." *United States v. Hays*, 515 U.S. 737, 742 (1995) (internal quotation marks and alterations omitted). To establish standing under Article III, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Sayles v. Advanced Recovery Sys., Inc.*, 865 F.3d 246, 250 (5th Cir. 2017).

## B. Facts Relevant to Standing Issue

Fried Alligator is a production company "within the entertainment industry." Doc. #22 at ¶ 9.[3] Tankersley is a member and agent of Fried Alligator. *Id.* at ¶¶ 8, 10. Since 2013, Tankersley has been the primary financing member of Fried Alligator charged with managing and securing financing for Fried Alligator's prospective entertainment projects. *Id.* at ¶ 10.

### 1. Initial discussions between Tankersley and NYL

---

[3] As evidence, Tankersley filed a sworn affidavit which affirms that "the factual allegations in the Amended Complaint are accurate and correct." Doc. #29-2. Thus, the facts alleged in the amended complaint constitute competent summary judgment evidence. *See State of Israel v. Motor Vessel Nili*, 435 F.2d 242, 251 (5th Cir. 1970) (relying on complaint sworn by Accountant General of Israel in separate affidavit as summary judgment evidence).

In the summer of 2013, Tankersley began meeting with Anna Muse Moses, an employee of NYL and family friend of Tankersley. *Id*. at ¶ 11. The meetings later included other NYL representatives, including Taylor Triplett. *Id*. During these meetings, Tankersley explained to Moses and Triplett that he desired to purchase life insurance or other NYL products that "would be a conduit to enhance financing options available for Fried Alligator's prospective and/or ongoing projects." *Id*. at ¶ 12. Tankersley further informed Moses and Triplett that "the building of cash value and/or the use of the product as collateral in conjunction with traditional financing products through banks were paramount concerns vital to the well[-]being and success of Fried Alligator." *Id*. Tankersley's explanations and representations "were all made on behalf of Fried Alligator, and for Fried Alligator's business purposes." *Id*. Moses, Triplett, and later Willis, "repeatedly affirmed" they understood why Tankersley sought these products for Fried Alligator. *Id*. at ¶ 13.

In late 2013, relying on advice of NYL representatives, Tankersley determined that a custom whole life insurance policy would best fit Fried Alligator's needs. *Id*. at ¶ 14. According to Tankersley, such a policy would build cash value quickly, and could serve as collateral to obtain more financing through traditional means. *Id*.

### 2. Discussions between Tankersley and Willis

In December of 2013, Tankersley was introduced to Willis at NYL, who "presented himself as an expert and seasoned professional veteran" and changed Tankersley's mind regarding the proper policy. Doc. #22 at ¶¶ 15–16, 18. NYL promoted Willis and encouraged Tankersley to rely on his expert and professional advice. *Id*. at ¶ 16. Willis belittled the concept of a custom whole life policy, and told Tankersley that "a universal policy was a far superior option to accomplish the purposes of Tankersley and Fried Alligator." *Id*. Willis represented that the cash value of the policy "could be used as collateral from day 1" and that "banks would loan

Tankersley as much as $5,000,000, the face value of the universal life policy, as long as the policy was used as collateral." *Id*. Tankersley believed Willis when Willis told him this product would suit his needs and be the best product he could purchase from NYL to accomplish the goals of Tankersley and Fried Alligator. *Id*. at ¶ 21.

The universal life policy is dated December 11, 2013, and names "Jerry Deane Tankersley" as the insured. Doc. #26-7 at 31. The insured is listed as the "owner;" [t]he "initial base policy face amount" is "$5,000,000.00;" the "planned monthly premium" is "$10,000;" and the "surrender charge premium" is "$165,070.29." *Id*. at 32, 33, 36. The beneficiaries listed are Suzy Bergner, Cheryl Wells, Teresa Garner, and Joy Campbell. *Id*. at 53.

As it turned out, Willis' advice was incorrect. Doc. #22 at ¶ 25. Unlike the custom whole life policy, the universal life product had substantial fees with high surrender charges, was a modified endowment contract with tax consequences, did not as aggressively build cash value, and was not acceptable for collateral with banks. *Id*. at ¶¶ 17–24. Because of the high surrender values, Tankersley continued to contribute to the universal life product which simultaneously deprived him of the ability to fund Fried Alligator projects, resulting in Fried Alligator's inability to fund at least one project. *Id*. at ¶¶ 28–31. Had Tankersley received the custom whole life policy, the funds would have been available to fund such project. *Id*. at ¶ 31.

### 3. Attempts to modify policy

Sometime in 2014, Tankersley realized the policy was useless for his needs. Doc. #22 at ¶ 25. Tankersley informed Moses of his problems with the policy, and Moses reported the situation to NYL. *Id*. at ¶ 26. NYL met with Tankersley and acknowledged he received bad advice and that "he should be put back in the position he would have been but for the bad advice." *Id*. However, due to the surrender fee to swap out the policy and the tax consequences, the policy was not changed. *Id*. at ¶¶ 27–28. Tankersley continued paying the premiums. *Id*.

In late 2014, Tankersley approached NYL again regarding the problems with his policy. *Id*. at ¶ 33. At some point, an agent recommended that he reapply for a custom whole life policy and file an "errors and omissions claim against Moses." *Id*. Tankersley viewed this option as unsatisfactory because "it put the onus on Tankersley to repair the problem … [and i]t also required Tankersley to incur the costs of bringing a claim against Moses, who did nothing wrong …." *Id*. In the middle of 2015, NYL tried "to make it right" by converting the universal life policy to a custom whole life policy but left it as a modified endowment contract creating tax issues for Tankersley. *Id*. at ¶ 34–35.

The custom whole life policy, dated June 2, 2015, with terminal digits 90, lists "Jerry Deane Tankersley" as the named insured and owner. Doc. #26-8 at 68–70. The monthly premium is $9,635.77. *Id*. at 71. The beneficiaries are listed as Joy Campbell, Cheryl Wells, Suzy Bergner, and Teresa Garner. *Id*. at 83.

## C. Analysis

### 1. Breach of contract

In its factual attack on standing, NYL argues Fried Alligator is neither a party nor third party beneficiary to either contract. Fried Alligator responds that it "is not … seeking to enforce a life insurance policy; it is seeking to hold NYL liable for selling a financial product and insurance policy that did not do what NYL said it would." Doc. #30 at 14–15. More specifically, Fried Alligator asserts that it, through Tankersley's interactions with NYL, entered into an oral contract with NYL to purchase "an insurance policy which NYL promised would meet its financing needs, [and] the policy's failure to do so constitutes a breach of [that oral] contract." *Id*. at 16. Alternatively, Fried Alligator argues it is a third party beneficiary of oral promises between Tankersley and NYL made for Fried Alligator's benefit. *Id*. at 18–19.

#### a. *Claims premised on written agreements*

As an initial matter, the failure to raise an argument in response to a motion to dismiss operates as a waiver of such argument. *See Jaso v. The Coca Cola Co.*, 435 F. App'x. 346, 358 n.12 (5th Cir. 2011) ("Jaso has waived this argument on appeal by failing to raise it below in response to Defendants' motion to dismiss.") (citing *Miller v. Nationwide Life Ins. Co.*, 391 F.3d 698, 701 (5th Cir. 2004)). Accordingly, where a party's standing to enforce a contract is challenged in a motion to dismiss, the failure to address standing in a response justifies dismissal on those grounds. *Rutter v. Conseco Life Insur. Co.*, No. 3:09-cv-680, 2011 WL 2532467, at *5 (S.D. Miss. June 24, 2011).[4]

Because Fried Alligator asserts that it is not seeking to enforce the written insurance policy between Tankersley and NYL, either as a party or third party beneficiary, the Court deems waived all claims by Fried Alligator based on breach of the written policies.[5] *See generally Los Alamos Study Grp. v. U.S. Dep't of Energy*, 692 F.3d 1057, 1066 n.2 (10th Cir. 2012) ("[W]e have no duty to investigate grounds for jurisdiction not raised by a party.") (emphasis omitted). Thus, the Court will consider Fried Alligator's breach of contract claim premised only on any oral agreements between NYL and Fried Alligator, or between Tankersley and NYL.

### b. Existence of oral contract

Although it is less than clear, it appears Fried Alligator argues that it had an enforceable oral contract with NYL that NYL would offer Tankersley a suitable insurance policy which could be used as future collateral in a loan. *See* Doc. #30 at 15–16.

---

[4] *See also Amburgey v. Atomic Ski USA, Inc.*, No. 06-149, 2007 WL 4468707, at *5 (D. Me. Dec. 17, 2007) ("Atomic, a non-party to the Rental/Release Form, failed to address the question of its standing to invoke that contract's benefits, thereby waiving that argument."); *Allstate Ins. Co. v. Glob. Med. Billing, Inc.*, 520 F. App'x 409, 412 (6th Cir. 2013) ("Plaintiff's failure to respond to Defendants' attack on its standing and its failure to refute the assertion that it had been fully reimbursed amounts to a waiver of the argument, and we decline to address it on appeal.").

[5] Later in its brief, Fried Alligator argues it has stated a third party beneficiary claim under the insurance policy between Tankersley and NYL. However, because Fried Alligator failed to make such argument for purposes of standing, the Court deems the argument waived. Additionally, this argument is deemed waived as to any claims that the third party beneficiary argument could be asserted as a basis for stating a claim.

It is basic contract law that a "formation of a contract, either oral or written, requires (1) an offer, (2) acceptance of the offer, and (3) consideration." *Reeves v. Midcontinent Express Pipeline, LLC*, 119 So.3d 1097, 1101 (Miss. Ct. App. 2013). Fried Alligator's oral contract argument fails for lack of consideration.

"Consideration has been defined as (a) an act other than a promise, or (b) a forbearance, or (c) the creation, modification or destruction of a legal relation, or (d) a return promise, bargained for and given in exchange for the promise." *Estate of Davis v. O'Neill*, 42 So. 3d 520, 527 (Miss. 2010) (internal quotation marks omitted). "If an agreement is to be held supported by consideration, that consideration must come from the parties to the agreement." *Daniel v. Snowdoun Ass'n*, 513 So.2d 946, 949 (Miss. 1987). Fried Alligator has not alleged that it gave NYL anything in return for the promise that the policy could be immediately used as collateral. Accordingly, the facts fail to establish the existence of an oral contract between Fried Alligator and NYL.

### 2. Third-party beneficiary claim based on oral agreement

Similarly, Fried Alligator has failed to prove by a preponderance of the evidence that it is a third-party beneficiary of an oral contract between Tankersley and NYL.

Mississippi law grants a person third-party beneficiary with an interest in a contract:

(1) When the terms of the contract are expressly broad enough to include the third party either by name as one of a specified class, and (2) the said third party was evidently within the intent of the terms so used, the said third party will be within its benefits, if (3) the promisee had, in fact, a substantial and articulate interest in the welfare of the said third party in respect to the subject of the contract.

*Simmons Hous., Inc. v. Shelton ex rel. Shelton*, 36 So.3d 1283, 1286 (Miss. 2010). Thus, the third-party interest must "spring" from the terms of that contract. *Trammell v. State*, 622 So.2d

1257, 1260 (Miss. 1993).[6]

Nowhere has Fried Alligator presented evidence of the terms of an oral contract between NYL and Tankersley. To the extent Fried Alligator relies on NYL's assurances that the policy could be used as collateral for Fried Alligator's financing, such alleged contract must fail for lack of consideration. *See O'Neill*, 42 So.3d at 527. Therefore, Fried Alligator has not established standing to bring a third-party beneficiary claim based on an oral contract between Tankersley and NYL.

### 3.  Breach of duty of good faith and fair dealing

NYL argues that "because Fried Alligator has no contractual relationship with [NYL] and is not a third-party beneficiary, [NYL] owed it no duty of good faith and fair dealing." Doc. #26 at 17.

"The duty of good faith and fair dealing arises from the existence of a *contract* between the parties." *Am. Bankers' Ins. Co. of Fla. v. Wells*, 819 So.2d 1196, 1207 (Miss. 2001). Thus, for a breach of the duty of good faith and fair dealing to exist, a valid contract must first exist. *Id*. Because Fried Alligator has failed to establish a contractual relationship with NYL, either directly or as a third-party, it does not have a legal right recognized by law to bring a claim for breach of the duty of good faith and fair dealing. Accordingly, this claim must be dismissed for lack of standing.

### 4.  Other claims

NYL asserts that because Fried Alligator is not a third-party beneficiary, it "lacks standing to bring any of its other claims as well." Doc. #26 at 17. As explained above, Fried Alligator has waived its right to bring any claims based on enforcement of the universal life

---

[6] Whether a third party may be a beneficiary to an oral contact appears to be an open question under Mississippi state law. Nonetheless, Fried Alligator has failed to establish by a preponderance of the evidence that it is a third party beneficiary of purported oral promises between NYL and Tankersley.

insurance policy.  Accordingly, NYL's motion to dismiss Fried Alligator's other claims for lack of standing will be granted to the extent it seeks dismissal of claims that rely on the universal life policy's enforcement.

### D.  Summary

The Court concludes that Fried Alligator lacks standing to assert its claims against the defendants for breach of contract, third party beneficiary, and breach of the duty of good faith and fair dealing, for failure to establish a contractual relationship between Fried Alligator and NYL.  To the extent any of Fried Alligator's remaining claims depend on enforcement of the insurance policy, dismissal will be granted as to those claims.

### IV
### Motion for Judgment on the Pleadings

Next, the Court addresses NYL's motion to dismiss the remaining claims, which Willis joined.  Because both NYL and Willis filed an answer to the amended complaint before moving to dismiss Fried Alligator's claims for failure to state a claim, the motion will be analyzed under Rule 12(c) as a motion for judgment on the pleadings.[7]

### A.  Standard

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  The standard for deciding a Rule 12(c) motion "is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim."  *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). "The central issue is whether, in the light most favorable to the plaintiff, the complaint states a valid claim for relief."  *Id*. (quoting *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002)).  On a Rule 12(c) or Rule 12(b)(6) motion:

---

[7] *See Bright v. Tunica Cty. Sch. Dist.,* No. 3:16-cv-197, 2017 WL 3996410, at *2 (N.D. Miss. Sept. 11, 2017) (construing post-answer motion under Rule 12(c)).

the complaint "does not need detailed factual allegations," but it must provide the plaintiff's grounds for entitlement to relief—including factual allegations that, when assumed to be true, "'raise a right to relief above the speculative level.'"

*Taylor v. Shreveport*, 798 F.3d 276, 279 (5th Cir. 2015) (quoting *N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*, 781 F.3d 182, 191 (5th Cir. 2015).

"As in the context of Rule 12(b)(6), the Court considering a Rule 12(c) motion may consider: (a) documents attached to the complaint or identified as central to the claims made therein; (b) documents attached to the motion to dismiss that are referenced in the complaint; and (c) documents that are subject to judicial notice as public record." *Sparks v. Tex. Dep't of Transp.*, 144 F.Supp.3d 902, 903 (S.D. Tex. 2015) (citing *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011)).

### B. Analysis

NYL argues that Fried Alligator has failed to state a claim for breach of fiduciary duty, negligence, gross negligence, misrepresentation, promissory and equitable estoppel, and breach of implied-in-fact contract.

### 1. Breach of fiduciary duty

For its breach of fiduciary duty claim, Fried Alligator alleges the "Defendants had a relationship of special obligation and trust and therefore had fiduciary, heightened obligations to … Fried Alligator which they breached." Doc. #22 at ¶ 41. The defendants argue that the universal insurance policy does not give rise to a fiduciary relationship between NYL and Fried Alligator, and that Fried Alligator has failed to show any other relationship with NYL.

To state a claim for breach of fiduciary duty under Mississippi law, a plaintiff must show the existence of a fiduciary duty and a breach of such duty. *See Lowery v. Guar. Bank and Tr. Co.*, 592 So.2d 79, 83 (Miss. 1991) ("A fiduciary duty must exist before a breach of the duty can occur."). "In Mississippi, the purchase of insurance is deemed to be an arms' length transaction.

Thus, [u]nder Mississippi law, there is no fiduciary relationship or duty between an insurance company and its insured in a first party insurance contract." *Booker v. American Gen. Life and Accident Ins. Co.*, 257 F.Supp.2d 850, 856 (S.D. Miss. 2003) (citations omitted). Generally, "[t]he severity of the burdens and penalties integral to a fiduciary relationship should not apply to ordinary insurance policy transactions." *Robley v. Blue Cross/Blue Shield of Miss.*, 935 So.2d 990, 996 (Miss 2006). "[B]ut in some rare cases the terms of the contract itself create a fiduciary relationship." *Id.* at 995.

Here, as explained above, Fried Alligator has not established a contractual relationship with NYL. Thus, the relationship between Fried Alligator and NYL does not fall into the category of rare cases where a fiduciary duty may arise from contract. Rather, Fried Alligator argues that a fiduciary relationship arose from the dealings between Tankersley, acting on its behalf, and NYL employees. Doc. #30 at 23 & n.13. To this end, Fried Alligator relies on *Ross-King-Walker, Inc. v. Henson*, 672 So.2d 1188, 1191 (Miss. 1996), in which a party other than the insured established a breach of fiduciary duty claim against an insurance agency. Aside from arguing no oral contract exists, NYL replies that Fried Alligator's response does not support a fiduciary duty because it has not established that there was (1) a relationship of "special trust and confidence" between the parties, or (2) "on one side an overmastering influence or, on the other, weakness, dependence, or trust, justifiably reposed." Doc. #45 at 8.

*Henson* involved circumstances that are not presented here, most notably a fifteen-year business relationship between the insured and the insurer. 672 So.2d at 1190. Fried Alligator has alleged nothing to overcome the general rule that no fiduciary duty exists in insurance relationships, particularly in situations where, like Fried Alligator, it is not a party to the

insurance contract.[8]  Under these circumstances, NYL's motion will be granted as to the breach of fiduciary duty claim.

## 2.  Negligence and gross negligence

Fried Alligator alleges that the "Defendants owed a duty of reasonable care and committed actionable negligence" as set forth in the amended complaint.  Doc. #22 at ¶ 38. Fried Alligator also asserts a claim for gross negligence.  *Id*. at ¶¶ 70–72.  NYL argues that because Fried Alligator's alleged injuries were not reasonably foreseeable, Fried Alligator has not established that NYL owed it any duty.  As for Fried Alligator's gross negligence claim, NYL argues that, because Fried Alligator has failed to establish the element of duty required to establish negligence, its gross negligence claim must also fail.  Doc. #26 at 21.

To prevail in a negligence action, a plaintiff must show (1) the existence of a duty to conform to a specific standard for the protection of others against the unreasonable risk of injury; (2) a breach of that duty; (3) a causal relationship between the breach and alleged injury; and (4) injury or damages.  *Laurel Yamaha, Inc. v. Freeman*, 956 So.2d 897, 904 (Miss. 2007) (internal quotation marks omitted).  Whether a duty exists in a negligence case is a question of law to be determined by the Court.  *Brown v. J.J. Ferguson Sand & Gravel Co.*, 858 So.2d 129, 131 (Miss. 2003).

"[T]he important component of the existence of the duty is that the injury is 'reasonably foreseeable ….'"  *Rein v. Benchmark Const. Co*., 865 So.2d 1134, 1146 (Miss. 2004) (internal quotation marks and emphasis omitted).  To satisfy the requirement of foreseeability, "a plaintiff is not required to prove that the exact injury sustained by the plaintiff was foreseeable; rather, it is enough to show that the plaintiff's injuries and damages fall within a particular kind or class of

---

[8] The other opinion relied upon by Fried Alligator is easy distinguishable because the insured asserted the breach of fiduciary duty claim.  *See Head v. United Ins. Co. of Am*., 966 F. Supp. 455, 457 (N.D. Miss. 1997) (insured sued insurance agent on alleged breach of fiduciary duty for selling duplicate insurance policies).

injury or harm which reasonably could be expected to flow from the defendant's negligence." *Glover ex rel. Glover v. Jackson State Univ.*, 968 So.2d 1267, 1278 (Miss. 2007). Of relevance here, an insurance agent has a duty to exercise reasonable care in procuring the coverage requested and will be independently liable if he negligently procures inadequate coverage for the insured. *See, e.g., McKinnon v. Batte*, 485 So.2d 295, 297 (Miss. 1986).[9]

Fried Alligator alleges Tankersley requested an insurance policy from NYL that could immediately be used as collateral to finance Fried Alligator's projects. Thus, NYL owed a duty to Tankersley as the insured. However, Fried Alligator is not the insured under the universal life policy. The ultimate question then is whether NYL could reasonably foresee that a failure to provide such a policy would cause Fried Alligator to lose financing opportunities resulting in loss of revenues. Fried Alligator alleges Willis told Tankersley that "the universal life policy for the use of Fried Alligator would provide immediate collateral value to support a loan of $5,000,000, which could be used for Fried Alligator projects." Doc. #22 at ¶ 20. Fried Alligator also alleges that "Willis told [Tankersley] this product would suit his needs and would be the best product he could purchase from NYL to accomplish the goals of Tankersley and Fried Alligator." *Id*. at ¶ 21.

NYL relies on *Rein*, in which the Mississippi Supreme Court held that a construction company "may have reasonably foreseen an insect infestation as a result of improper construction techniques and poor planning of the draining system. However, [i]t could not [have] reasonably foreseen that [a nursing home resident] would be killed by a fire ant attack two years after construction…." 865 So.2d at 1146. The court reasoned the "terrible tragedy that occurred

---

[9] *See also Simpson v. M–P Enters., Inc*., 252 So.2d 202, 207 (Miss. 1971) (recognizing "a well-settled rule that if an agent or broker with a view of being compensated agrees to procure insurance for another and through fault or neglect fails to do so, he will be liable for any damage that results thereby"); *Haggans v. State Farm Fire & Cas. Co*., 803 So.2d 1249, 1252 (Miss. Ct. App. 2002) (recognizing duty of insurance agent to exercise reasonable diligence in obtaining policy conforming to request of the insured).

… was an unusual, improbable, … extraordinary occurrence … [and] too remote to require [the defendant] to foresee …." *Id.*

Based on Fried Alligator's allegations, the Court concludes that NYL owed no duty to Fried Alligator. The policy was not intended to insure Fried Alligator, and Fried Alligator's alleged lost financial opportunities would not have been covered by the policy. Fried Alligator admits the policy would only provide the "threshold" financing for additional financing that *could* be used to finance a project that *could* result in revenues. While Fried Alligator alleges all other financing was in place but for the portion to be collateralized by the insurance policy, Fried Alligator's success on entertainment projects is too improbable and remote for NYL to foresee. Accordingly, NYL's motion will be granted as to Fried Alligator's negligence claim.

Because "the threshold for submitting the question of gross negligence to the jury is higher than the threshold for submitting the question of simple negligence," Fried Alligator's claim for gross negligence must also fail.[10] *McDonald v. Lemon-Mohler Ins. Agency, LLC*, 183 So. 3d 118, 126 (Miss. Ct. App. 2015) (citing *Allen v. Blanks*, 384 So.2d 63, 67 (Miss.1980)).

### 3. Breach of implied-in-fact contract

Fried Alligator's breach of implied-in-fact contract claim is based on the defendants' statements and conduct toward Tankersley which is alleged to have "constituted an implied promise to provide an insurance policy which would serve the business needs of Fried Alligator." Doc. #22 at ¶ 47. NYL argues that because the purpose of the insurance policy was not written into the policy itself, any discussions concerning Fried Alligator are prior or contemporaneous negotiations that do not give rise to an implied-in-contract claim. Doc. #26 at 28–29.

---

[10] Fried Alligator also premises its gross negligence claim on the "plainly erroneous advice" of Willis as well as "unprofessional comments about co-worker Moses" and that "NYL knew or should have known of Willis [sic] propensity for unprofessional conduct and should have put measures in place to protect clients and potential clients from Willis' negligence, breaches of fiduciary duty, and/or misrepresentations about NYL products." Doc. #22 at ¶ 71. Based on the analysis above, none of these conclusory allegations establish NYL owed a duty to Fried Alligator.

An implied-in-fact contract "arises from the conduct of the parties." *Franklin v. Franklin ex rel. Phillips*, 858 So.2d 110, 120 (Miss. 2003). "[A]ny conduct of one party from which the other party may draw the inference of a promise is effective as such and the conduct of the parties is viewed as a reasonable man would to determine the existence or not of the contract implied in fact." *Id.* at 121 (implying contract between attorneys for the payment of legal fees based on amount of work performed). This has the same legal effect as an express contract even if the promise had "not been fully expressed in words." *Kaiser Invs., Inc. v. Linn Agriprises, Inc.*, 538 So.2d 409, 413 (Miss. 1989) (question of fact whether parties' conduct concerning crop planting and financing amounted to lease agreement).

Fried Alligator's amended complaint is devoid of any factual allegation concerning conduct of NYL from which the Court may draw an inference of a promise to Fried Alligator. At most, the amended complaint sets forth allegations that Tankersley and Willis discussed the purpose of the insurance policy. Accordingly, the Court will grant NYL's motion to dismiss as to this claim.

### 4. Misrepresentation, promissory estoppel, and equitable estoppel

Fried Alligator's claims for "misrepresentation,"[11] promissory estoppel, and equitable estoppel are based on allegations of the defendants' false representations or promises concerning the policy. Doc. #22 at ¶¶ 52–54, 55–59, 60–62. Specifically, Fried Alligator alleges NYL represented to it, through Tankersley, that "the universal life insurance policy for use of Fried Alligator would provide immediate collateral value to support a loan of $5,000,000 which could be used for Fried Alligator projects." Doc. #22 at ¶ 20.

Each of these claims requires reasonable reliance. *Poppelreiter v. GMAC Mortg., LLC*,

---

[11] Based on Fried Alligators' allegation that NYL made statements it knew or should have known were false, Fried Alligator appears to assert a claim for both fraudulent and negligent misrepresentation. The parties address both in their briefing.

No. 1:11-cv-008, 2011 WL 2690165, at *4 (N.D. Miss. July 11, 2011) (citation omitted) (fraudulent or intentional misrepresentation requires reliance on misrepresentation's truth and hearer's right to rely thereon); *Holland v. Peoples Bank & Tr. Co.*, 3 So.3d 94, 101 (Miss. 2008) (negligent misrepresentation requires "the plaintiff reasonably relied upon the misrepresentation or omission"); *C.E. Frazier Constr. Co. v. Campbell Roofing & Metal Works, Inc.*, 373 So.2d 1036, 1038 (Miss. 1979) (promissory estoppel requires promise actually being relied on and refusal to enforce promise would be to virtually sanction perpetuation of fraud or would result in other injustice); *PMZ Oil Co. v. Lucroy*, 449 So.2d 201, 206 (Miss. 1984) ("A party asserting equitable estoppel must show … that he has changed his position in reliance upon the conduct of another" when "acting reasonably in [his] own right"). Thus, Fried Alligator's allegations must support an inference that (1) it did in fact rely on NYL's representations that the universal life insurance policy could be used by Fried Alligator as collateral, and (2) it was reasonable in doing so.

The insurance policy, however, was not intended to insure Fried Alligator, nor was Fried Alligator a third party beneficiary under the policy. It was Tankersley, not Fried Alligator, who relied on the representations in entering into the universal life policy. This is not a situation where the policy is between Fried Alligator and NYL, and Tankersley signed on Fried Alligator's behalf as its agent. The complaint is only conclusory in alleging that Fried Alligator relied on the representations and, in some instances, only alleges that Tankersley relied.[12]  Because the allegations do not allege facts that Fried Alligator reasonably relied on NYL's representations, Fried Alligator's claims for misrepresentation (fraudulent and negligent), promissory estoppel,

---

[12] *See, e.g.*, Doc. #22 at ¶ 53 ("Tankersley and Fried Alligator reasonably relied to their own detriment on such statements."); *id*. at ¶ 56 ("Tankersley reasonably relied to his and Fried Alligator's detriment …."); *id*. at ¶¶ 61–62 ("Tankersley reasonably believed and detrimentally relied upon [the defendants' representation] to purchase the universal insurance policy instead of the whole life policy.").

and equitable estoppel must be dismissed. *See Hall v. Associated Int'l Ins. Co.*, 494 F. App'x 902, 905 (10th Cir. 2012) (affirming district court's conclusion "that the Master Policy was not intended to insure [plaintiff], and the facts he alleges in his Complaint are insufficient, or otherwise directly contradicted by properly considered documents, to support his claim that he justifiably relied on any representations") (internal quotation marks and alterations omitted).

## C. Summary

In sum, Fried Alligator's claims for negligence, gross negligence, breach of fiduciary duty, breach of implied-in-fact contract, misrepresentation, promissory estoppel, and equitable estoppel will be dismissed.[13] Fried Alligator has not sought leave to amend any claims that are subject to dismissal but notes that its intentional misrepresentation claim must be dismissed without prejudice, and that it may seek leave if it desires to re-plead its claims. Doc. #30 at 30.

"In view of the consequences of dismissal on the complaint alone, and the pull to decide cases on the merits rather than on the sufficiency of pleadings, district courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal." *Great Plains Tr. Co.*, 313 F.3d at 329. While this rule is normally stated in the context of Rule 12(b)(6) motions, it applies to Rule 12(c) dismissals as well. *See U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 637, 644–45 (6th Cir. 2003) (district court abused its discretion by dismissing under Rule 12(c) with prejudice); *Pinto v. Microsoft Corp.*, No. 12-60509, 2012 WL 4479059, at *3 (S.D. Fla. Sep. 28, 2012) (collecting cases).

The Court cannot say that it is clear the defects identified in this order are incurable or

---

[13] NYL's motion does not address the amended complaint's "vicarious liability" claim; nor does NYL address the claim for "malicious conduct," to the extent malicious conduct is raised as a separate claim from gross negligence.

that Fried Alligator is unwilling or unable to amend in a manner that will avoid dismissal. Accordingly, the dismissal of these claims will be without prejudice to Fried Alligator seeking leave to amend.

## V
## Motion for Summary Judgment

NYL argues it is entitled to summary judgment on Tankersley's claims for two reasons: "first, he knowingly and willingly signed a binding release and settlement that bars any and all claims Tankersley may have against New York Life;" and second, regarding "any MEC-related claims[,] Tankersley suffered no injury …." Doc. #26 at 6 (alterations and quotation marks in original removed).

### A. Standard

Under Rule 56 of the Federal Rules of Civil Procedure, "[s]ummary judgment is proper only when the record demonstrates that no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law." *Luv N' Care Ltd. v. Groupo Rimar*, 844 F.3d 442, 447 (5th Cir. 2016). "A factual issue is genuine if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party and material if its resolution could affect the outcome of the action." *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 226 (5th Cir. 2015) (internal quotation marks omitted). On a motion for summary judgment, a court must "consider the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor." *Edwards v. Cont'l Cas. Co.*, 841 F.3d 360, 363 (5th Cir. 2016).

In seeking summary judgment, "[t]he moving party bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015) (internal quotation

marks and alterations omitted). If the moving party satisfies this burden, "the non-moving party must go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* (internal quotation marks omitted). "Where the nonmoving party bears the burden of proof at trial, the moving party satisfies this initial burden by demonstrating an absence of evidence to support the nonmoving party's case." *Celtic Marine Corp. v. James C. Justice Cos., Inc.*, 760 F.3d 477, 481 (5th Cir. 2014).

## B. Factual Background

Due to his dissatisfaction with the universal life insurance policy, in May or June of 2015, Tankersley reached out to Moses for assistance converting the universal life policy to a whole life policy. Doc. #29-1 at ¶¶ 2–3. As an example of what such whole life policy would be, Moses sent Tankersley a whole life policy illustration dated June 2, 2015. *Id.* at ¶ 4 & Ex. B. The illustration indicated that Tankersley's "new whole life policy would have a beginning cash surrender value of $140,289 at inception based on $236,090 in premium already paid." *Id.* at ¶ 5 & Ex. B. The illustration further showed that the "cash surrender value would immediately grow, such that [his] guaranteed cash value would be $225,702 by year 2 but possibly as much as $240,599 ...." *Id.* Also on June 2, 2015, a "custom whole life" policy ending in "090" was issued to Tankersley. Doc. # 45-1 at ¶ 8; Doc. #45-3 at 3.[14]

On June 4, 2015, Tankersley wrote to NYL, expressing his discord with the universal life policy because it could not be used to obtain bank loans, and seeking to do "a 1035 exchange of the $116,090 cash value of the existing Universal Life policy" to "the cash value of the current Custom Whole Life Policy." Doc. #29-1 at ¶ 3 & Ex. A. Also in June, Tankersley attended a

---

[14] Neither party disputes that the policy ending in 090 is not consistent with the June 2, 2015, illustration Tankersley received from Moses.

meeting with Brad Jennsen, an NYL employee or agent. *Id*. at ¶ 7. At this meeting, Jennsen represented that if Tankersley accepted the settlement, he "would be placed in a whole life policy as if [he] had been in the whole life policy all along (i.e., since December, 2013)." *Id*. at ¶ 8.

On or about July 20, 2015, NYL executed the cash surrender of the universal life insurance policy and transferred the proceeds to Policy 090. Doc. #45-1 at ¶ 9. Because Tankersley complained that the surrender charge had been assessed, NYL agreed to waive it as part of a final settlement with Tankersley. *Id*.

According to its business records, Moses prepared a second illustration on July 21, 2015, corresponding to the Custom Whole Life Insurance Policy ending in 090. Doc. #45-1 at ¶ 5; Doc. #45-2. Tankersley signed the July 21, 2015, illustration on September 11, 2015. Doc. #45-2 at 8.

NYL sent a letter to Tankersley dated September 21, 2015, enclosing an offer and release. Doc. # 28-1 at ¶ 9 & Ex. D. The letter provided:

> In the interest of good customer relations and in order to resolve any misunderstanding that may have occurred, we are glad to offer the following resolution to your concerns. Upon receipt of the signed, enclosed "Offer & Release", we offer to waive the surrender charge of $67,600.00 on your Universal Life (UL) policy 61 207 206 and allow you to transfer the $112,485.44 cash value to your Custom Whole Life (CWL) policy 24 305 090.
>
> If you accept our offer, we ask that you kindly sign the attached **OFFER AND RELEASE** and return it to us within 30 days ….

*Id*. at Ex. D. The enclosed offer and release provided:

> I Jerry Tankersley, accept your offer as outlined in your letter dated September 21, 2015, where New York Life Insurance and Annuity Corporation (NYLIAC) will waive the surrender charge of $67,600.000 on my Universal Life (UL) policy 61 207 206 and allow me to transfer the $112,485.44 cash value to my Custom Whole Life (CWL) policy 24 305 090.
>
> I understand that, by signing and agreeing to this Offer & Release ("Agreement"), I am releasing any and all claims I may have against NYLIAC … including Michael Willis and Ana Moses ….

*Id.* Tankersley believed that the letter was "consistent with what Jennsen had represented in the meeting and with the June 2, 2015, illustration." Doc. #29-1 at ¶ 9.

To confirm his understanding of the release, Tankersley engaged in many texts and verbal conversations with Moses. *Id.* at ¶ 10. On September 21, 2015, at 7:34 p.m., Tankersley texted Moses, "I just read the letter again.. I have a question.. if you have a min call me or first thing mañana please.." *Id.* at ¶ 12. Moses "verif[ied] that the settlement would place [Tankersley] in essentially the same position [he] would have been in if [he] had started with the whole life policy initially," in 2013. *Id.* at ¶ 13. Tankersley also asked "how much value [his] new 'custom' whole life policy was expected to have by June 1, 2016" to which Moses said she needed to review some information and would get back to him. *Id.*

The following day, Moses texted Tankersley, referencing a chart also texted, "Here is what you look like right now. Last 2 columns on far right is all you need to look at. 'Cash Value' and 'Death Benefit' columns just add $112,482 to both columns. Just so you can see something right now." *Id.* at ¶ 15 (internal footnote omitted) & Ex. F. The $112,482 is the amount stated in the offer and release that would be transferred into the "custom" whole life policy at the time of conversion. *Id.* at ¶ 15 n.2. Tankersley understood this to mean that he should add $112,482 to the values in the far right columns of the chart. That is, as of September 22, 2015, the policy would have a "right now" value of $112,485 + $30,175, totaling $142,660. *Id.* at ¶ 17. This confirmed to Tankersley what he generally understood in the meeting with Jennsen—that his "new whole life policy would be as if [he] had started from the date [he] had bought the universal life policy (December 2013)." *Id.* at ¶ 17; *see also id.* at ¶¶ 18–21.

Based on the June 2, 2015, illustration and Moses' representations about the terms of the agreement and substance of the custom policy, Tankersley signed the release believing the custom whole life policy would match the June 2, 2015, illustration. *Id.* at ¶¶ 4, 11, 22.

However, the 090 Policy mentioned in the release actually matched the July 21, 2015, illustration.  Doc. #45-1 at ¶ 7.

Around six months after signing the release, in March 2016, Tankersley texted Moses, "I am working on another equity deal for another movie. Would you please inquire and confirm that my cash / surrender value will be approximately $236,000;" to which Moses replied, "yes, I confirm that the figures on your illustration are what your value is worth in that year stated." Doc. #29-1 at ¶ 23 & Ex. G.  The "$236,000" was a "rough calculation" of "the base amount of the policy as of September 22, 2015 ($142,485 according to Ms. Moses) plus 9.5 months of $9,600 premiums."[15]  *Id*. at ¶ 23 n.3.  Not understanding what Moses meant, as no year was stated, Tankersley texted again, "Just to clarify, my cash/surrender value in the new policy will be around $250,000 on June 2 of this year 2016 … I need my cash value to grow rapidly .. Movies are going .. Making offers to actors tomorrow.. Thanks.."  *Id*. at ¶ 25 & Ex. H.  Moses responded, "You are correct!!!"  *Id*.  By this statement, "Moses again confirmed [his] policy would be growing immediately with a value of some $250,000 having accumulated by June, 2016, merely 9 months after the settlement."  *Id*. at ¶ 25.

But, when Tankersley cashed out, two months later, he received $144,111.17.  *Id*. at ¶ 32; Doc. #26-1 at ¶ 8.

## C.  Analysis

Tankersley admits that he signed the offer and release but argues his underlying claims should proceed because (1) the settlement agreement is void, and (2) NYL breached the settlement agreement.

Tankersley argues the settlement agreement is void because NYL represented to him that

---

[15] This number correlates to the June 2, 2015, illustration which indicates a cash value of $240,599 in year 2 of the policy.  *Id*. at ¶ 23 n.3.

under the release, he would receive a custom whole life policy as if it began in December 2013, rather than the "start over" policy he actually received.  Doc. # 30 at 8–10.

"[W]hether a release was void because of 'an absence of good faith and full understanding of legal rights and [nature] and effect of instrument was misrepresented' [is] a question of fact for a jury."  *Royer Homes of Miss., Inc. v. Chandeleur Homes, Inc*., 857 So.2d 748, 755 (Miss. 2003) (jury question as to validity of release when plaintiff assured medical bills would be paid) (citing *Willis v. Marlar*, 458 So.2d 722, 724 (Miss. 1984)).[16]  "[W]here there are allegations made as to the validity of a release due to fraud, misrepresentation, adhesion or other inequities then the case goes properly to the jury or fact finder."  *Royer*, 857 So.2d at 757.

NYL argues the July 21, 2015 illustration that Moses provided, and Tankersley signed before entering into the settlement agreement, "superseded" the June 2, 2015 Illustration,  and the cash values shown in the July 21, 2015 illustration are the same as the cash values of the 090 Policy issued to Tankersley.  However, when Tankersley signed the July 21, 2015 illustration on September 11, 2015, his funds had already been transferred into the 090 Policy in July.  At that point, the evidence suggests the only illustration he had seen was the June 2, 2015, illustration. Also, Moses' representations after September 11, 2015, suggest that the 090 Policy was not a start over policy.  Thus, NYL raises the precise factual question to be determined by the jury.[17]

NYL also argues that Tankersley has not sufficiently alleged facts to support a claim that NYL knowingly misrepresented a fact at the time of the misrepresentation.  Citing general

---

[16] *Accord, Whitehead v. Johnson*, 797 So.2d 317. 319 (Miss. Ct. App. 2001) (en banc) (question of fact as to procurement of release because plaintiff's affidavit stated she was advised release was for property damage and did not release her personal injury claims).

[17] NYL, relying on the dissent in *Whitehead*, further argues that because the release unambiguously states his funds were to be transferred to the 090 Policy, no question of fact exists.  Doc. #45 at 2–3. The dissent in *Whitehead*, argued that the unambiguous release at issue in the case should be "an absolute bar to [the] action."  797 So.2d at 324 (McMillin, C.J., dissenting).  This Court declines to adopt the dissent.  As mentioned above, the Mississippi Supreme Court has held "that a jury should be allowed to decide the issue of whether a release was obtained in good faith and with the full understanding on the plaintiff's part of his legal rights" and if "the nature and effect of instrument was misrepresented."  *Royer Homes,* 857 So.2d at 755–58 (approving of *Whitehead*).

contract law, NYL argues that to avoid a contract, Tankersley must establish fraudulent inducement.

First, this is inconsistent with *Royer*'s holding, which relates specifically to a settlement agreement, and only requires a plaintiff to show lack of good faith and understanding of legal rights. Bad faith is "characterized by some conduct which violates standards of decency, fairness, or reasonableness." *Montgomery v. CitiMortgage, Inc.*, 955 F. Supp. 2d 640, 657 (S.D. Miss. 2013). Under Mississippi law, an insurer's gross negligence may rise to the level of bad faith. *See, e.g., Caldwell v. Alfa Ins. Co.*, 686 So.2d 1092, 1095 (Miss. 1996) ("To recover punitive damages from an insurer for "bad faith", the insured must prove by a preponderance of evidence that the insurer acted with (1) malice, or (2) gross negligence or reckless disregard for the rights of others."). Thus, fraudulent inducement is not required to show lack of good faith in the execution of a release of claims.

Even if fraudulent inducement were required, Tankersley has raised an issue of fact as to whether he was fraudulently induced into signing the release. Tankersley has presented evidence from which the Court can infer NYL misrepresented that the 090 Policy, which was the subject of the release, was consistent with the June 2, 2015 illustration. Accordingly, Tankersley has raised a question of fact as to the absence of good faith and full understanding of his legal rights. Therefore, NYL's motion for summary judgment as to its release defense must be denied.[18] Because the Court will deny summary judgment on this ground, the Court need not reach Tankersley's argument that NYL's breach of the release would permit his claims to proceed. Doc. #30 at 4.

---

[18] To the extent NYL argues that Fried Alligator is bound by the settlement because Tankersley was acting as its agent, such argument must also fail given that a question of fact exists as to the procurement of the release.

### D. MEC-Related Claims

Throughout the amended complaint, the plaintiffs refer to the universal life policy as a "modified endowment contract" that created tax consequences for Tankersley. *See, e.g.*, Doc. #22 at ¶¶ 27, 34. NYL argues that to the extent Tankersley seeks "recovery for alleged creation of a Modified Endowment Contract ("MEC"), such claims are meritless and [NYL] is entitled to judgment as a matter of law." Doc. #26 at 10. Tankersley has not responded to NYL's argument.

A failure of a party's responsive brief to address arguments raised in a motion for summary judgment operates as a waiver of such argument. *See Hensley v. Wal-Mart Stores Inc.*, 290 F. App'x. 742, 743–44 (5th Cir. 2008) ("This court has consistently held that arguments not raised in response to a motion for summary judgment are waived and cannot be considered on appeal.") (citing *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 339–40 (5th Cir. 2005)).

It is unclear whether the plaintiffs' have asserted any MEC-related claims. However, to the extent they are pled, the claims are deemed waived because Tankersley has failed to respond. Accordingly, the Court will grant NYL's summary judgment motion on Tankersley's MEC-related claims, to the extent such claims are asserted.

### E. Willis' Summary Judgment Arguments

In his joinder to NYL's summary judgment motion, Willis not only "adopt[ed] and incorporate[d] herein [NYL's] Motion and Memorandum Brief in their entirety," but also asserted arguments of his own for summary judgment as to the claims against him. Doc. #27. Willis argues that he is entitled to summary judgment (1) because he was never a party to the contracts, he cannot be liable for any of the plaintiffs' claims dependent thereon, and (2) as an agent of NYL, he is not liable for breach of a duty or breach of a contract when acting on behalf of a known principal. Doc. #27 at 1–2. Such arguments will not be considered.

Willis' arguments were not raised in NYL's motion. Willis did not file his own separate

motion for summary judgment but chose instead to file only a joinder in NYL's motion. Accordingly, the Court only addresses the grounds and arguments raised in NYL's motion. *Chipman v. Nelson*, No. 211-cv-2770, 2017 WL 4012306, at *4 (E.D. Cal. Sept. 12, 2017).

Even if Willis' joinder filing was deemed to constitute his own summary judgment motion (to the extent it goes beyond adoption of NYL's motion), such does not comply with the Court's local procedural rules. *See* L.U. Civ. R. 7(b)(2) ("memorandum brief must be filed as a separate docket item from the motion"), 7(b)(2)(B) ("motion may not exceed four pages, excluding exhibits, may contain only the grounds for the request and may not contain legal argument or citations to case law or other secondary authority"),[19] 7(b)(4) ("At the time the motion is served, … counsel for movant must file a memorandum brief in support of the motion"). For all such reasons, Willis' arguments beyond those encompassed by his joining NYL's motion, are stricken.

## VI
## Conclusion

For the reasons above:

1.　　The plaintiffs' motion to strike [47] is **DENIED**.

2.　　Willis' motion for additional pages [44] is **GRANTED**.

3.　　New York Life Insurance Company's "Motion for Summary Judgment and for Dismissal" [25] is **GRANTED in Part and DENIED in Part** as follows:

　　　　a.　　Fried Alligator's claims for breach of contract, third party beneficiary, and breach of good faith and fair dealing are **DISMISSED** for lack of standing. To the extent any of Fried Alligator's other claims depend on the insurance policies issued to Tankersley, they are dismissed for lack of standing.

---

[19] The length of NYL's motion in addition to the length of Willis' joinder exceed the allowable page limit for motions.

b. Fried Alligator's claims for negligence, gross negligence, breach of fiduciary duty, breach of implied-in-fact contract, misrepresentation, promissory estoppel, and equitable estoppel, are **DISMISSED without prejudice**.  Within fourteen (14) days of the filing of this order, Fried Alligator may seek leave to reassert such claims.

c. The motion is denied to the extent it seeks summary judgment based on the defense of the settlement agreement as to Tankersley's claims.

d. The motion is granted to the extent it seeks summary judgment as to the plaintiffs' MEC-related claims, to the extent such claims are asserted.

4. To the extent Willis raises his own arguments for summary judgment in his joinder [27], those arguments are **STRICKEN**.

**SO ORDERED**, this 29th day of September, 2017.

<u>**/s/Debra M. Brown**</u>
**UNITED STATES DISTRICT JUDGE**