**IN THE UNITED STATED DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**GREENVILLE DISTRICT**

**JERRY TANKERSLEY**                                                  **PLAINTIFFS**

**VS.**                              **CIVIL ACTION NO.  4:16-VCV-00175-DMB-JMV**

**NEW YORK LIFE INSURANCE**
**COMPANY, MICHAEL WILLIS,**
**and JOHN DOES 1-10**                                               **DEFENDANTS**

**<u>SECOND AMENDED COMPLAINT</u>**

**(JURY TRIAL DEMANDED)**

COMES NOW, the Plaintiff, Jerry Tankersley, and files this Second Amended

Complaint against the Defendants, New York Life Insurance Company, Michael Willis,

and John Does 1-10, in compliance with this Court's written order entered November

15, 2017 [Doc. 61], and, in support of their claim, would show as follows:

**<u>Parties</u>**

1.      The Plaintiff, Jerry Tankersley ("Tankersley"), is an individual residing at

318 Howard Street, Greenwood, Mississippi  38390.

2.      At all pertinent times, Tankersley was a member of Fried Alligator.  At all

pertinent times, Tankersley had authority to pursue the business interests of Fried

Alligator and to act on its behalf.

3.      The Defendant, New York Life Insurance Company ("New York Life" or

"NYL"), is an insurance company licensed to do and doing business within the State of

Mississippi, and having its principal place of business at 51 Madison Avenue, New York,

New York  10010.  New York Life Insurance Company may be served with process of

this Court by serving its designated agent for service of process in Mississippi, CT

Corporation System of Mississippi, 645 Lakeland East Drive, Suite 101, Flowood, MS 39232.

4.     The Defendant, Michael Willis, is an individual residing in Tennessee who is or was at all pertinent times an employee and/or agent of New York Life Insurance Company.  He may be served with process at his place of employment, AIG Capital Services, Inc., 2000 American General Way, Brentwood, TN 37027.

5.     Defendant John Does 1-10 are persons or entities affiliated with New York Life and/or who have acted in concert with New York Life, whose identities are currently unknown.  All allegations and claims alleged and asserted against New York Life are incorporated herein by reference against the Doe Defendants.

## Jurisdiction and Venue

6.     This Court has personal and subject matter jurisdiction over the defendants who were doing business in Mississippi at all pertinent times and/or who committed tortious acts in Mississippi, and/or who breached contracts in the State of Mississippi.  Jurisdiction is proper in this Court pursuant to 28 U.S.C. sec. 1332.

7.     Venue is proper in this Court pursuant to 28 U.S.C. sec. 1391.

## Facts

8.     The Plaintiff, Fried Alligator is a limited liability company formed in the State of Mississippi.  Tankersley is a member of Fried Alligator and conducts or oversees the business of Fried Alligator with respect to financing and financial administration.  Fried Alligator's financial business was at all pertinent times conducted primarily in Leflore County, including through banking and financial outlets in Leflore

2

County, and through activities of general business, including insurance and financing business, conducted at and around 318 Howard Street, Greenwood, Mississippi.

9.     Fried Alligator has at all pertinent times been engaged in various production and entertainment projects.  Fried Alligator is a film production company operating in the entertainment industry and routinely evaluates prospective projects in the entertainment industry.  This work includes producing film projects and all that that entails, including choosing projects, contracting with actors, venturing with related entities, and all aspects involved in starting a film project from the start and completing it through production.  Fried Alligator, subsequent to the events set forth herein, has successfully produced entertainment projects and has conducted business profitably, having won awards within the entertainment industry including a Sundance Film Festival award.

10.     In 2013 and presently, Tankersley was the primary financing member of Fried Alligator.  In his role as member and agent of Fried Alligator who was responsible to make sure that Fried Alligator had the ability to finance prospective projects, Tankersley explored various financial products and avenues to ensure that Fried Alligator could finance prospective entertainment projects.  The prospective projects available to the company into 2014 had significant and promising potential to be strong business opportunities generating high investment returns.  There was one particular project in 2014 that was particularly significant, and that was well beyond the initial stages, and which Tankersley on behalf of Fried Alligator was particularly interested in taking to the stage of production.  Tankersley was charged with managing and securing

3

the financing for these potential projects on behalf of Fried Alligator, particularly the referenced project.

11.     In the summer of 2013, Tankersley began meeting with Anna Muse Moses, an employee and/or agent for New York Life, as well as a family friend of Tankersley.  The meetings later included other employees and/or agents of NYL, including Taylor Triplett.

12.     Tankersley fully explained to Moses and/or Triplett the purposes and goals affiliated with the potential purchase of a life insurance or other NYL products. Tankersley specifically stated to Moses and others at NYL that any financial or insurance product purchased would be a conduit to enhance financing options available for Fried Alligator's prospective and/or ongoing projects.  Tankersley explained further that the building of cash value and/or the use of the product as collateral in conjunction with traditional financing products through banks were paramount concerns vital to the wellbeing and success of Fried Alligator.  Tankersley's explanations in this respect, and his goals affiliated with these products, were all made on behalf of Fried Alligator, and for Fried Alligator's business purposes.  Tankersley was authorized as a member and principal in Fried Alligator to explore these various business options and to engage in financial arrangements for the benefit of Fried Alligator, which is what Tankersley was doing throughout the entirety of his business relationship with NYL, its agents, and its employees.  All NYL agents and/or employees were aware of or should have been aware of these expressed and important goals to be met on behalf of Fried Alligator.

13.     NYL, through Moses, Triplett and other employees and agents, including the defendant Michael Willis, specifically understood the purposes and goals of Fried

4

Alligator as explained by Tankersley. They repeatedly affirmed and stated that they knew why Tankersley sought these products for Fried Alligator, and they also discussed different types of products with Tankersley to best fit the needs of Fried Alligator, *i.e.*, to maintain the type of asset(s) that could be used by Fried Alligator to collateralize or support financing to ensure that Fried Alligator could move quickly and easily to secure opportunities available to it for film production opportunities. The understanding of these agents is imputed to NYL, the principal of these agents, and/or the employer of these employees.

14. Ultimately, in late 2013, Tankersley, relying upon the advice of NYL and its agents or employees, determined that a custom whole life insurance policy best fit the needs of Fried Alligator. If structured correctly, it had the advantage of building cash value very quickly, and that cash value could serve as collateral for obtaining more financing through other traditional means, such as banks. In other words, a bank would be willing to loan money to Fried Alligator by attaching the life insurance policy as collateral. Not only would the life insurance policy have cash value that would build quickly, month-to-month, but the death benefit would likewise be attractive to financial institutions because they would have additional assurances that in the event of Tankersley's untimely death, they could recover on their loan. The custom whole life product, as explained by Moses and NYL, was attractive for the financial purposes of Fried Alligator. The custom whole life policy would have been a satisfactory financial product to meet the needs of Fried Alligator in late 2013 and throughout 2014. Tankersley was satisfied as of late 2013 that the custom whole life insurance policy would build value quickly given the high amount of premiums being invested by

Tankersley on behalf of Fried Alligator, which in turn, would enable Fried Alligator to pursue aggressively projects that were available.

15.     However, in December, 2013, at the insistence of New York Life, Tankersley was introduced to and met with New York Life agent Michael Willis.

16.     Willis presented himself as an expert and seasoned professional veteran, and NYL held out Willis in the same way.   NYL promoted Willis and in so doing encouraged Tankersley to rely upon Willis' alleged expert and professional advice. During the meeting in late 2013, Willis belittled the concept of a custom whole life policy that had been promoted by Moses, and he specifically told Tankersley that a universal policy was a far superior option to accomplish the purposes of Tankersley and Fried Alligator.  He claimed that the primary benefit of choosing the universal life product was that the policy itself, not just its cash value, could be used as collateral from day 1, such that the financing power available to the operations of Fried Alligator would be greatly enhanced.  Willis specifically represented that banks would loan Tankersley as much as $5,000,000, the face value of the universal life policy, as long as the policy was used as collateral.  Willis, knowing the purpose of the financial product, and knowing that Fried Alligator would rely on the product for its financing needs, shifted Tankersley's focus to this universal product, and the way Willis interested Tankersley in the universal life product was by telling Tankersley that banks would loan money on the face value of the policy, not just its cash value.  The face value obviously would be much higher than the cash value in the initial term of the policy; hence, Tankersley reasonably believed that if he chose the universal life policy, Fried Alligator would have more opportunity to borrow more money, if necessary, through the use of this universal life product.  Willis and

6

Tankersley discussed these issues in the presence of Moses, at the meeting in late 2013. Willis sold Tankersley on this product because he convinced Tankersley that it was a better product for the needs of Fried Alligator, and he knew Tankersley would rely on his expertise in this respect. Tankersley, trying to meet the financial needs of Fried Alligator, did reasonably rely on Willis, who held himself out as an expert, when Willis told him that Fried Alligator would benefit more from the universal life product than it would from the custom whole life product.

17.     Tankersley was not at the time very familiar with financial and insurance products of this nature, and unknown to Tankersley at the time, Willis's advice was a complete misrepresentation. Also unknown to Tankersley at that time, the fees associated with this universal life product were substantial, and the surrender charges were also very high. Also unknown to Tankersley at this time, Willis apparently stood to benefit more personally if Tankersley purchased the universal life product as opposed to the custom whole life product.

18.     Tankersley, as he had previously done throughout, expressed during this meeting with Willis that the purpose of this policy was to finance the ongoing business of Fried Alligator. Entering the meeting, Tankersley was satisfied with the custom whole life option as an adequate financial tool for the business of Fried Alligator, and believes it would have been such, but presented with this superior option by Willis, Tankersley reasonably relied upon Willis's professional advice given on behalf of NYL.

19.     Willis assured Tankersley not only that the universal life policy could be used as collateral but that its use as collateral was far superior to the ability of a custom whole life policy to be used as collateral. Triplett and/or Moses witnessed these

7

discussions and apparently were likewise convinced by Willis who NYL held out as the experienced professional qualified to give this advice.

20.     Willis specifically told Tankersley that the universal life policy for the use of Fried Alligator would provide immediate collateral value to support a loan of $5,000,000, which could be used for Fried Alligator projects.  Notably, the universal life policy did not build cash value aggressively as did the custom whole life policy, so it was less attractive from that standpoint, and as it turns out, from many other standpoints unknown to Tankersley at the time.  But the ability to use this product for Fried Alligator, the ability to take it to a bank and convince a bank to make a loan on this policy as collateral, made the universal life product attractive to Tankersley, who was shopping, so to speak, to make sure Fried Alligator could pursue its film business.

21.     Tankersley, individually and in his capacity as member and agent of Fried Alligator, believed Willis when Willis told him this product would suit Fried Alligator's needs and would be the best product he could purchase from NYL to accomplish the goals of Tankersley and Fried Alligator.  Tankersley also reasonably believed Willis was looking out for the interests of Fried Alligator and exercising reasonable care in providing the advice.  That is because Willis was told why Tankersley was considering NYL financial products.  Willis was told that this policy would be used to further the business of Fried Alligator.  That is why Willis appealed to a need of Fried Alligator in selling the universal life policy – because he knew Tankersley was seeking a financial product to benefit Fried Alligator.  In reliance on Willis' advice, Tankersley elected to forego the custom whole life product, which would have met the needs of Fried Alligator, and Tankersley instead elected to purchase the universal life policy.

22.     Tankersley's reliance was reasonable as Willis was presented as an expert in the field.  Tankersley had no reason to know that Willis's advice about this financial product was utterly false and that the product could not be used to accomplish any of the important goals of Fried Alligator and that, in fact, the universal life product was inferior to the custom whole life product as pertains to the purposes for which Tankersley and Fried Alligator were purchasing it.

23.     NYL, at Tankersley's request, issued the universal life product in place of the custom whole life product.  But for Willis' professional advice upon which Tankersley reasonably relied on behalf of Fried Alligator, Tankersley would have purchased the custom whole life policy.

24.     In 2014, after issuance of the universal life product, Tankersley set out on behalf of Fried Alligator to use the policy as collateral and/or as a financial conduit for the projects of Fried Alligator.  He conducted this business on behalf of Fried Alligator in Leflore County.  He was quickly told by a local bank with whom he had a long time relationship that the universal policy was *not* acceptable for collateral.  He tried another bank.  He received the same response.  In other words, when Tankersley approached banks to obtain loans to be used for the benefit of Fried Alligator film projects, the banks refused to do what Willis had said they would do, which is issue loans based on the face value of the universal life policy.

25.     It became clear to Tankersley that the universal policy was not a product that could be used for the purposes Willis had represented and that Willis' advice about the uses of the product were completely inaccurate and further that the policy was of no use to Tankersley or to Fried Alligator.  The policy did not build cash value speedily as

the custom whole life policy would have. Moreover, the policy could not be used as collateral.

26.     Tankersley brought the situation to the attention of Moses. Moses reported the situation to others in NYL including her immediate superiors. NYL met with Tankersley and acknowledged that he had received bad advice and acknowledged that he should be put back in the position he would have been but for the bad advice. In other words, NYL, recognizing that Tankersley had been sold a product that would not meet the needs of Fried Alligator, began to work with Tankersley in order to rectify the situation.

27.     Moses made inquiries within the company about altering the nature of the product to develop more cash value, as a custom life policy (originally contemplated) would have done. However, changing the nature of the policy or swapping it out for another policy such as the custom whole life policy proved difficult and took time. Apparently, part of the problem in making a switch was that NYL had already given commissions to the agents, and apparently the surrender fees associated with the universal life policy were exorbitant. Time passed, and with that time, opportunity also began to pass for Fried Alligator, which was involved in a potentially significant project. In other words, as time passed with NYL discussing the universal life policy and a "swap" with Tankersley, Fried Alligator remained in a position of having no financial asset for use in helping finance the potential project that was on the table.

28.     Tankersley was stuck with an expensive product that did not serve Fried Alligator's business purposes and that could not be cancelled or restructured except at great cost and penalty. NYL seemed to be struggling with making a swap or untangling

10

this unenviable situation. Because of what NYL had done through its agent Willis, *i.e.*, provided negligent and inaccurate advice, and because Willis and NYL and their agents had profited handsomely from Tankersley's acceptance of Willis's advice, Tankersley was stuck with a product unacceptable for the purposes that had caused him to do business with NYL in the first place.

29.    Faced with no good choice, not wanting to face penalties associated with starting over, Tankersley was forced to, and elected to, continue with the universal life product in order to avoid losses associated with surrender and in hopes that over time cash value would build to levels acceptable for purposes of Fried Alligator's business.

30.    For some time, Tankersley found himself pouring large cash payments into a policy that served no useful purpose, which simultaneously deprived him of the ability to fund Fried Alligator with the actual cash he otherwise would have had. In other words, not only did the universal life product not build cash value and not provide an asset upon which Tankersley could collateralize the business of Fried Alligator, but also Tankersley was obligated to pour large cash payments into the universal life policy, so he could not use cash he otherwise would have had available to help finance Fried Alligator's potential film projects.

31.    Fried Alligator, during this period, continued to have opportunities presented to it, some potentially very lucrative, but due to the circumstances referenced herein, funding was limited. At least one prospect could not be funded due to the universal life policy's nature in being a market security not appropriate for collateral and due to the policy's devouring Tankersley's excess cash. This prospect required a commitment to pay a willing actor a substantial sum of money, and Fried Alligator could

11

not make the financial commitment because it could not obtain the financing available to do so. But for the negligence and actions of NYL and its agents, Fried Alligator would have been able to pursue this project and pay the actor, which would have more likely than not led to substantial profits for Fried Alligator. But because NYL had placed Tankersley into the situation of being cash-strapped (by his obligation to pay for the universal life policy) and into the situation of not having viable collateral attractive to banks (by virtue of the nature of the universal life policy), Fried Alligator, as a result, lost this business opportunity. Fried Alligator and Tankersley made every effort to secure the necessary funds to pay the actor who otherwise would have committed but was simply unable to do so given the circumstances.

32. Accordingly, Fried Alligator missed a lucrative prospect simply because cash / financing was not available. Had Tankersley have had no policy or had he invested in the custom whole life policy as originally advised, the funds and financing would have been available to finance the prospect which had an upside in the tens of millions of dollars. In short, all components for successful production of this venture were in place except for the threshold financing that Tankersley / Fried Alligator were supposed to have provided but could not provide due to the advice and actions of NYL and its agent Willis.

33. Tankersley essentially remained a hostage to a policy that (a) demanded much of his money, (b) did not serve the purposes of Fried Alligator, and (c) required massive penalty and loss if surrendered.

34. Late in 2014, Tankersley approached New York Life again to seek a solution to this debilitating problem. At one point, a NYL agent or employee suggested

12

that Tankersley re-apply for the original custom whole life policy and to the extent of penalty he should file an errors and omissions claim against Moses. The problem with this "solution" was that it put the onus on Tankersley to repair a problem caused by New York Life's agent, Willis. It also required Tankersley to incur the cost of making claim against Moses, who did nothing wrong and who was a longtime family friend of Tankersley. And it simply allowed New York Life to continue its own misfeasance caused by Willis and New York Life by perpetuating a pattern of high premiums, fees and commissions. These acts of NYL were likewise against its client's best interests.

35.     By the middle of 2015, New York Life tried again to "make it right" but did not, and did not put Tankersley back in the same position in which he would have been had he purchased the custom whole life policy at the outset. NYL offered to provide Tankersley's whole life policy back up to levels it would have been but for the misfeasance of Willis and the company.

36.     However, when the "swap" finally occurred, more than a year had passed, and opportunity had passed for Fried Alligator with that time. Moreover, the "swap" never occurred in the manner in which NYL had represented, and Tankersley suffered continued loss through the swap process in that NYL did not put Tankersley in the same position he would have been in had he purchased the custom whole life policy in the first place.

37.     The years of misfeasance by NYL have cost Tankersley money and Fried Alligator opportunity to make substantial profit through lost business opportunities. The difficulties stated herein have further cost Tankersley an extensive amount of time and trouble.

## **Negligence**

38.     The Plaintiff re-alleges the allegations in paragraphs 1-37 above.

39.     The Defendants owed a duty of reasonable care and committed actionable negligence as set forth above.

40.     The Defendants had duties to Tankersley.  Both Tankersley and Fried Alligator suffered injury because of a breach of duty, and the damages are causally related to the breaches.  Moreover, the damages were reasonably foreseeable.

41.     Tankersley, a known member of Fried Alligator, at all pertinent times made clear that he was interested in a NYL product because the product would enable Fried Alligator to finance film projects.  He texted NYL agents about the fact that Fried Alligator was making movies and needed capital to do so and would use the NYL product in that process.  The issues were discussed at the inception of the universal life policy, and Willis and other agents knew that the reason Tankersley wanted the product was to finance business ventures of the film-production company, Fried Alligator.  Accordingly, NYL and its employees or agents knew the purpose for which the product would be used, and Willis specifically provided advice about which product (the universal life product) would best suit the needs of Fried Alligator.  The success of Fried Alligator, in turn, would benefit Tankersley.  NYL was engaging in business with and for the benefit of both Tankersley and NYL and knew that it was doing so.  NYL knew that the policy would be an asset used for financing and even Willis discussed how the policy could be used with banks to secure more significant financing.  NYL most likely could not name Fried Alligator as an insured because there was no life to ensure, but it certainly knew that its financial product was being used for the business of Fried

14

Alligator, and it further knew that if its product failed in its purpose of making financing available, then Fried Alligator could not undertake business successfully. NYL had the requisite knowledge to know that providing the product to Tankersley which could not be used in the manner as represented, would, in fact, cause harm to Fried Alligator. Fried Alligator never intended to be covered under the policy – nor could it be – but the policy was offered by NYL for a different purpose – as a financing tool. This is not at all unusual in the life insurance industry to offer products such as annuities and policies with cash value that can be used for many purposes beyond the strict purpose of insurance itself, and that is what NYL did – offer to Tankersley, for Fried Alligator, a financial product, that Willis claimed would finance the business of Fried Alligator. NYL at all times knew this policy was for a business venture, that it was needed for a specific purpose, that Fried Alligator was a for-profit business that needed financing, and in this context, it offered its advice about its product that it claimed would fit the needs of Fried Alligator.

43.     Tankersley, the contracting party, relied upon the advice of NYL and Willis. He relied upon their expertise for what he should purchase. He had a financial interest in purchasing the right product because the right product would advance the business of Fried Alligator, which he owned and in which he therefore had a financial interest. The negligent advice of Willis caused harm to Tankersley in the form of damages set forth herein, and Tankersley individually is entitled to pursue the damages, including consequential damages, associated with the negligence of Willis and NYL.

44.     As a result of the negligence of Willis and NYL, Tankersley and Fried Alligator incurred damages for which the Defendants are liable to Tankersley.

15

**Breach of Implied-in-Fact Contract**

45.     The Plaintiff re-alleges the allegations in paragraphs 1-44 above.

46.     The Defendants' statements to, and conduct toward, Tankersley constituted an implied promise to provide an insurance policy which would serve the business needs of Fried Alligator.

47.     The Defendants breached that promise without good cause and in bad faith.  Tankersley and Fried Alligator reasonably relied to their own detriment on this promise.

48.     As a result, Tankersley and Fried Alligator incurred damages for which the Defendants are liable to Tankersley.

49.     As set forth in the above allegations of negligence, Tankersley himself relied upon the representations about the uses of the product, and because it turned out that the uses of the product were not as represented, not only was Fried Alligator's business damaged, but Tankersley's financial interest was damaged because he had a vested interest in Fried Alligator.  Tankersley was told by Willis that the best policy for his use, and for Fried Alligator's use, was the universal life policy.  That is a representation by Willis that was not true.  It was an assurance by Willis that both Tankersley and Fried Alligator would be best served by the universal life policy.  That assurance and representation by Willis led to an approximate 18-month period where Tankersley poured money into the universal life policy that provided no value to him because it did not meet the stated purpose of helping him finance his company operations.  Tankersley was personally harmed by Willis's expressions that the universal life policy product would benefit him, would enable him to get immediate and

16

significant financing for his company, and this breach of implied contract was made to Tankersley who was known to be working on behalf of Fried Alligator. The promise was: a universal life policy is what should be purchased because that policy will enable Fried Alligator to obtain immediate and significant financing to undertake the film production opportunities available to it.

50.     The breach of implied-in-fact contact arose from the conduct of the parties; Tankersley reasonably drew inference of a promise that if he chose the universal life product for his business of Fried Alligator, he could obtain financing for that business, and Tankersley reasonably chose this route and changed his course of action away from the product (custom whole life) that would have worked for his business. Had Willis said nothing, Tankersley would have bought the whole life policy, and he would have had available financing through that product to conduct and finance the film-making deals available for Fried Alligator. Willis assured Fried Alligator – through his assurances to Tankersley – that this product would meet its needs, and Willis was fully aware of those needs.

51.     Accordingly, Willis and NYL breached an implied-in-fact contract which caused damages to Tankersley.

**Misrepresentation**

52.     The Plaintiff re-alleges the allegations in paragraphs 1-51 above.

53.     The Defendants made statements to Tankersley that were false and that they either knew to be false or that they should have known to be false. Tankersley was pursuing the business of Fried Alligator. Tankersley, and therefore Fried Alligator, reasonably relied to their own detriment on such statements. These statements

17

consisted of representations that the universal life product would meet the stated needs of Fried Alligator. The statements were persuasive – they induced Tankersley to forego a product that would have worked for him and for his company and change his position and decision in reliance to accept the advice and representation of Willis to purchase a product that cost significant money but did not meet his needs or Fried Alligator's needs. This situation persisted for some eighteen (18) months over which time Tankersley was unable to use his own cash income to finance Fried Alligator because he was investing it in the ill-advised universal life policy that Willis had represented to be a superior business option to meet a specific business need. Willis knew that Fried Alligator had a need. Willis made an ill-advised recommendation. Willis knew Tankersley wanted the policy as financial product to be used for the benefit of Fried Alligator. Tankersley relied on Willis' advice and recommendation, and he did so as agent and member of Fried Alligator. Tankersley's reliance was also on behalf of Tankersley, who was a member with a financial interest in Fried Alligator. When Willis' made the misrepresentation, it harmed Tankersley and it harmed Tankersley's business. Tankersley changed his position in reliance on Willis. He would have purchased the custom whole life policy but for Willis' advice. This change in position was detrimental to Tankersley because the custom whole life policy would have met the needs of Tankersley and Fried Alligator. While the policy did not insure Fried Alligator, that was not the intended purpose of the financial product. The policy was represented as a financial product that would benefit Fried Alligator. Willis specifically said so. He said the universal life policy could be used by Fried Alligator to obtain financing for its business. This representation was false, yet Tankersley and Fried Alligator believed it

18

to be true, and they relied upon its truth, and they changed their course of action (away from the custom whole life policy), to their financial detriment because they lost a business opportunity because they could not use the universal life policy as collateral. Losing financing made Fried Alligator lose business, and that cost Tankersley money. All of Tankersley's reliance was in his capacity as an agent for Fried Alligator in pursuing interests on behalf of Fried Alligator.

54.   As a result, Tankersley and Fried Alligator incurred damages for which Defendants are liable to Tankersley.

**Promissory Estoppel**

55.   The Plaintiff re-alleges the allegations contained in paragraphs 1-54.

56.   The Defendants made promises to Tankersley that they intended for Tankersley to rely upon to purchase the universal insurance policy.   Tankersley reasonably relied to his and Fried Alligator's detriment upon those promises.

57.   The Defendants breached their promises.

58.   As a result, Tankersley and Fried Alligator incurred damages for which Defendants are liable to Tankersley.

59.   A refusal to enforce these promises would result in injustice.

60.   More specifically, The Defendants made statements to Tankersley that were false and that they either knew to be false or that they should have known to be false.   Tankersley was pursuing the business of Fried Alligator.   Tankersley, and therefore Fried Alligator, reasonably relied to their own detriment on such statements. These statements consisted of representations that the universal life product would

19

meet the stated needs of Fried Alligator. The statements were persuasive – they induced Tankersley to forego a product that would have worked for him and for his company and change his position and decision in reliance to accept the advice and representation of Willis to purchase a product that cost significant money but did not meet his needs or Fried Alligator's needs. This situation persisted for some eighteen (18) months over which time Tankersley was unable to use his own cash income to finance Fried Alligator because he was investing it in the ill-advised universal life policy that Willis had represented to be a superior business option to meet a specific business need. Willis knew that Fried Alligator had a need. Willis made an ill-advised recommendation. Willis knew Tankersley wanted the policy as financial product to be used for the benefit of Fried Alligator. Tankersley relied on Willis' advice and recommendation, and he did so as agent and member of Fried Alligator. Tankersley's reliance was also on behalf of Tankersley, who was a member with a financial interest in Fried Alligator. When Willis' made the misrepresentation, it harmed Tankersley and it harmed Tankersley's business. Tankersley changed his position in reliance on Willis. He would have purchased the custom whole life policy but for Willis' advice. This change in position was detrimental to Tankersley because the custom whole life policy would have met the needs of Tankersley and Fried Alligator. While the policy did not insure Fried Alligator, that was not the intended purpose of the financial product. The policy was represented as a financial product that would benefit Fried Alligator. Willis specifically said so. He said the universal life policy could be used by Fried Alligator to obtain financing for its business. This representation was false, yet Tankersley and Fried Alligator believed it to be true, and they relied upon its truth, and they changed

20

their course of action (away from the custom whole life policy), to their financial detriment because they lost a business opportunity because they could not use the universal life policy as collateral. Losing financing made Fried Alligator lose business, and that cost Tankersley money. All of Tankersley's reliance was in his capacity as an agent for Fried Alligator in pursuing interests on behalf of Fried Alligator.

61. As a result, Tankersley and Fried Alligator incurred damages for which Defendants are liable to Tankersley.

**Equitable Estoppel**

62. The Plaintiff re-alleges the allegations contained in paragraphs 1-61.

63. The Defendants made representations about the universal insurance policy that Tankersley reasonably believed and detrimentally relied upon to purchase the universal insurance policy instead of the whole life policy. Tankersley was acting on behalf of himself and Fried Alligator in conducting this business, and Willis and NYL knew that to be true. They specifically knew the purposes for which these business products were being considered and used.

64. The Defendants made statements to Tankersley that were false and that they either knew to be false or that they should have known to be false. Tankersley was pursuing the business of Fried Alligator. Tankersley, and therefore Fried Alligator, reasonably relied to their own detriment on such statements. These statements consisted of representations that the universal life product would meet the stated needs of Fried Alligator. The statements were persuasive – they induced Tankersley to forego a product that would have worked for him and for his company and change his position and decision in reliance to accept the advice and representation of Willis to purchase a

product that cost significant money but did not meet his needs or Fried Alligator's needs. This situation persisted for some eighteen (18) months over which time Tankersley was unable to use his own cash income to finance Fried Alligator because he was investing it in the ill-advised universal life policy that Willis had represented to be a superior business option to meet a specific business need. Willis knew that Fried Alligator had a need. Willis made an ill-advised recommendation. Willis knew Tankersley wanted the policy as financial product to be used for the benefit of Fried Alligator. Tankersley relied on Willis' advice and recommendation, and he did so as agent and member of Fried Alligator. Tankersley's reliance was also on behalf of Tankersley, who was a member with a financial interest in Fried Alligator. When Willis' made the misrepresentation, it harmed Tankersley and it harmed Tankersley's business. Tankersley changed his position in reliance on Willis. He would have purchased the custom whole life policy but for Willis' advice. This change in position was detrimental to Tankersley because the custom whole life policy would have met the needs of Tankersley and Fried Alligator. While the policy did not insure Fried Alligator, that was not the intended purpose of the financial product. The policy was represented as a financial product that would benefit Fried Alligator. Willis specifically said so. He said the universal life policy could be used by Fried Alligator to obtain financing for its business. This representation was false, yet Tankersley and Fried Alligator believed it to be true, and they relied upon its truth, and they changed their course of action (away from the custom whole life policy), to their financial detriment because they lost a business opportunity because they could not use the universal life policy as collateral. Losing financing made Fried Alligator lose business, and that cost Tankersley money.

All of Tankersley's reliance was in his capacity as an agent for Fried Alligator in pursuing interests on behalf of Fried Alligator.

65.     As a result, Tankersley and Fried Alligator incurred damages for which Defendants are liable to Tankersley.

### Gross Negligence and/or Malicious Conduct

66.     The Plaintiff re-alleges the allegations contained in paragraphs 1-65.

67.     The defendants NYL and Willis engaged in gross negligence and or willful and/or malicious misconduct in putting their own interests ahead of those of their clients, and in providing plainly erroneous advice that should have been and probably was well known to Willis.  NYL knew or should have known of Willis propensity for unprofessional conduct and should have put measures in place to protect clients and potential clients from Willis' negligence, breaches of fiduciary duty, and/or misrepresentations about NYL products.  NYL did nothing or not enough to oversee and monitor this sort of detrimental behavior.  Accordingly, both NYL and Willis should be assessed punitive damages in an amount sufficient to deter future behavior of this nature.

### Breach of Contract

68.     In the alternative, the Plaintiff re-alleges the allegations in paragraphs 1-67 above and assert breach of contract and breach of settlement agreement on behalf of Tankersley.

69.     For the reasons set forth in their responsive pleadings with respect to the Motions to Dismiss and Motion for Judgment on the pleadings, which are incorporated by reference, the Defendant NYL breached its contract with Tankersley by failing to perform an agreement to put Tankersley back in the same position which he otherwise

would have been in if he had purchased the custom whole life policy in the first place. Specifically, Tankersley attempted to "turn back the clock" to the original terms of the original offer of a custom whole life product, and NYL entered into an agreement to put Tankersley back in the same contract position that he would have been in if he had purchased the custom whole life policy in the first place in December, 2013. Yet NYL did put Tankersley back in the same position but substantially shorted him when converting the universal life policy to a custom whole life policy in approximately June, 2015. By not performing on the agreement, Tankersley incurred damages. He lost the revenue to which he would have been entitled had the custom whole life policy been funded as agreed upon, and he incurred consequently damages associated with the breaches by NYL.

70.    Tankersley is entitled to all damages caused by the breach of contract, including consequential and incidental damages.

## Breach of Duty of Good Faith and Fair Dealing

71.    The Plaintiff re-alleges the allegations set forth in Paragraphs 1-70 above.

72.    The Defendants' actions constitute a breach of the duty of good faith and fair dealing toward Tankersley.

73.    NYL entered contracts with Tankersley. It had a duty to perform all contracts in good faith and with fair dealing. NYL failed to do so for all of the reasons set forth herein.

74.    As a result, Tankersley incurred damages for which NYL is liable.

## Vicarious Liability

75.     The Plaintiff re-alleges the allegations contained in paragraphs 1- 74.

76.     The defendant NYL is vicariously liable for the acts and/or omissions and/or negligence and/or breach of duty of the individual defendants and/or agents.  In the alternative, NYL Firm is liable on the basis of principal and agent.

## Damages

77.   As a direct and proximate result of the Defendants' breaches, acts, and omissions, as described herein and to be established at trial, the Plaintiff has been damaged and is entitled to relief as follows:

(A)     Return of all premiums, costs, fees, commissions, and expenses associated in any way with the purchase of any NYL product;

(B)     Loss of earnings of Tankersley and Fried Alligator with respect to lost business opportunities proximately caused by the Defendants' breaches, including the loss of project(s) in the 2014 timeframe which reasonably would have returned 7 or 8 figure returns to Fried Alligator and/or Tankersley;

(C)     Loss of value and damage to business reputation of Tankersley and Fried Alligator proximately caused by the Defendants' breaches and any business losses or lost valuation to Fried Alligator in any way associated with the wrongful and/or negligent conduct of the Defendants, or any of them;

(D)     Punitive damages for the Defendants' tortious, malicious, wilful, wanton, reckless, and/or grossly negligent conduct sufficient to punish and deter and make an example of the Defendants to discourage other insurers and their agents from engaging in such misconduct, taking into account the Defendants' financial condition, all in an

amount sufficient to achieve the public purposes underlying an award of punitive damages, as may be determined by the Court and/or jury;

(E)     Prejudgment interest on all amounts and compensatory damages awarded by the Court and/or jury;

(F)     Mental and emotional distress;

(G)     Inconvenience and aggravation damages;

(H)     Attorneys' fees and costs of litigation;

(I)      Additional damages to be specified at trial after discovery is completed;

(J)     Such further general or specific relief to which the Plaintiffs are entitled at law or in equity.

*WHEREFORE, PREMISES CONSIDERED,* the Plaintiff hereby demands damages, as set forth above, in amounts to be proven at trial and determined by a jury, against all Defendants, plus prejudgment interest and costs and such other damages as allowed under Mississippi law.

THIS, the 15th day of November, 2017.

Respectfully submitted,

*C. Maison Heidelberg*_____
C. MAISON HEIDELBERG, MB: 9559
Attorney for Plaintiff, Jerry Tankersley

OF COUNSEL:

WATSON HEIDELBERG JONES PLLC
2829 Lakeland Drive, Suite 1502
Flowood, Mississippi 39232
P.O. Box 23546
Jackson, Mississippi 39225-3546
Phone: 601-939-8900
Fax:     601-932-4400
mheidelberg@whjpllc.com

26

<u>CERTIFICATE OF SERVICE</u>

I, C. Maison Heidelberg, attorney for the Plaintiffs, do hereby certify that I have this day served a true and correct copy of the above and foregoing document via the Court's electronic filing system on the following:

William F. Ray
W. Abram Orlansky
WATKINS & EAGER PLLC
P. O. Box 650
Jackson, MS  39201

Kenna L. Mansfield
WELLS MARBLE & HURST, PLLC
300 Concourse Blvd., Suite 200
Ridgeland, MS  39157

THIS, the 15th day of November, 2017.

*C. Maison Heidelberg*
C. MAISON HEIDELBERG

27